**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**


LARRY ALONZO GIBBS, JR.,

      Petitioner,

v.                                        Case No. 3:17-cv-766-J-32JBT

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

      Respondents.

_____

## **ORDER**

### I.   **Status**

Petitioner, an inmate of the Florida penal system, initiated this case by filing a pro se Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254. Doc. 1. He is challenging a state court (Nassau County, Florida) judgment of conviction for three counts of capital sexual battery and one count of lewd and lascivious molestation of a child less than 12 years of age, by a person 18 years of age or older. He has been adjudicated as a sexual predator and is currently serving a life term of incarceration. Id. Respondents have responded. See Doc.

20; Response.[1] Petitioner filed a Reply. See Doc. 40. This case is ripe for review.

## II.    **Governing Legal Principles**

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. See Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016), cert. denied, 137 S. Ct. 1432 (2017). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. See Marshall v. Sec'y Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale in order for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter, 562 U.S. 86, 100 (2011). Where the state court's adjudication on the merits is unaccompanied by an explanation,

> the federal court should "look through" the unexplained
> decision to the last related state-court decision that
> does provide a relevant rationale. It should then
> presume that the unexplained decision adopted the

---

[1] Attached to the Response are numerous exhibits. See Doc. 20-1. The Court cites to the exhibits as "Resp. Ex."

> same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(1), (2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." Id. § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. [at 102] (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an

3

> unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

Bishop v. Warden, GDCP, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified).

### B. Exhaustion and Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his state conviction. See 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. Castille v. Peoples, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); see also Pope v. Rich, 358 F.3d 852, 854 (11th Cir. 2004) (noting "that Boerckel applies to the state collateral review process as well as the direct appeal process.").

In addressing exhaustion, the United States Supreme Court explained:

4

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights.'" <u>Duncan v. Henry</u>, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam) (quoting <u>Picard v. Connor</u>, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. <u>Duncan</u>, <u>supra</u>, at 365-366, 115 S. Ct. 887; <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L.Ed.2d 1 (1999).

<u>Baldwin v. Reese</u>, 541 U.S. 27, 29 (2004).

A state prisoner's failure to properly exhaust available state remedies results in a procedural default which raises a potential bar to federal habeas review. The United States Supreme Court has explained the doctrine of procedural default as follows:

> Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. <u>See</u>, <u>e.g.</u>, <u>Coleman</u>,[2] <u>supra</u>, at 747–

---

[2] <u>Coleman v. Thompson</u>, 501 U.S. 722 (1991).

> 748, 111 S. Ct. 2546; <u>Sykes</u>,[3] <u>supra</u>, at 84–85, 97 S. Ct. 2497.  A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. <u>See</u>, <u>e.g.</u>, <u>Walker v. Martin</u>, 562 U.S. --, --, 131 S. Ct. 1120, 1127–1128, 179 L.Ed.2d 62 (2011); <u>Beard v. Kindler</u>, 558 U.S. --, --, 130 S. Ct. 612, 617–618, 175 L.Ed.2d 417 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. <u>See</u> <u>Coleman</u>, 501 U.S., at 750, 111 S. Ct. 2546.

<u>Martinez v. Ryan</u>, 566 U.S. 1, 9-10 (2012). Thus, procedural defaults may be excused under certain circumstances. Notwithstanding that a claim has been procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from the default; or (2) a fundamental miscarriage of justice. <u>Ward v. Hall</u>, 592 F.3d 1144, 1157 (11th Cir. 2010). In order for a petitioner to establish cause and prejudice,

> the procedural default "must result from some objective factor external to the defense that prevented [him] from raising the claim and which cannot be fairly attributable to his own conduct." <u>McCoy v. Newsome</u>, 953 F.2d 1252, 1258 (11th Cir. 1992) (quoting <u>Carrier</u>, 477 U.S. at 488, 106 S. Ct. 2639).[4] Under the prejudice prong, [a petitioner] must show that "the errors at trial

---

[3] <u>Wainwright v. Sykes</u>, 433 U.S. 72 (1977).

[4] <u>Murray v. Carrier</u>, 477 U.S. 478 (1986).

> actually and substantially disadvantaged his defense
> so that he was denied fundamental fairness." <u>Id.</u> at
> 1261 (quoting <u>Carrier</u>, 477 U.S. at 494, 106 S. Ct. 2639).

<u>Wright v. Hopper</u>, 169 F.3d 695, 706 (11th Cir. 1999).

In the absence of a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice, there
> remains yet another avenue for him to receive
> consideration on the merits of his procedurally
> defaulted claim. "[I]n an extraordinary case, where a
> constitutional violation has probably resulted in the
> conviction of one who is actually innocent, a federal
> habeas court may grant the writ even in the absence of
> a showing of cause for the procedural default." <u>Carrier</u>,
> 477 U.S. at 496, 106 S. Ct. at 2649. "This exception is
> exceedingly narrow in scope," however, and requires
> proof of actual innocence, not just legal innocence.
> <u>Johnson v. Alabama</u>, 256 F.3d 1156, 1171 (11th Cir.
> 2001).

<u>Ward</u>, 592 F.3d at 1157. "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." <u>Johnson v. Alabama</u>, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." <u>Calderon v. Thompson</u>, 523 U.S. 538, 559 (1998) (quoting

7

Schlup, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. Schlup, 513 U.S. at 324.

### C. Ineffective Assistance of Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003), and Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish ineffective assistance, a person must show that: (1) counsel's performance was outside the wide range of reasonable, professional assistance; and (2) counsel's deficient performance prejudiced the challenger in that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance. Strickland, 466 U.S. at 687.

Notably, there is no "iron-clad rule requiring a court to tackle one prong of the Strickland test before the other." Ward v. Hall, 592 F.3d 1144, 1163 (11th Cir. 2010). Since both prongs of the two-part Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). As

8

stated in <u>Strickland</u>: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.

"The question is not whether a federal court believes the state court's determination under the <u>Strickland</u> standard was incorrect but whether that determination was unreasonable - a substantially higher threshold." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard," then a federal court may not disturb a state-court decision denying the claim. <u>Richter</u>, 562 U.S. at 105.  As such, "[s]urmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010). "Reviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" <u>Daniel v. Comm'r, Ala. Dep't of Corr.</u>, 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting <u>Strickland</u>, 466 U.S. at 689). "When this presumption is combined with § 2254(d), the result is double deference to the state court ruling on counsel's performance." <u>Id.</u> (citing <u>Richter</u>, 562 U.S. at 105); <u>see</u> <u>also</u> <u>Evans v. Sec'y, Dep't of Corr.</u>, 703 F.3d 1316, 1333-35 (11th Cir. 2013) (en banc) (Jordan, J., concurring); <u>Rutherford v. Crosby</u>, 385 F.3d 1300, 1309 (11th Cir. 2004).

### III.  **Evidence at Trial**

Petitioner raises eighteen grounds for relief. To add context to these claims, the Court summarizes the evidence produced at trial. The victim, C.S., was 14 years old at the time of trial. Resp. Ex. F at 163. She testified Petitioner was her stepfather and the only father figure she has ever known. Id. C.S. explained she and her little sisters lived with Petitioner and their mother, beginning when C.S. was the age of 5 until October 2011, when she and her little sisters moved in with her grandmother and she stopped having contact with Petitioner and her mother. Id. at 165. Before moving in with her grandmother, C.S. stated they moved around a lot between Duval County, Florida, and Nassau County, Florida. Id.

C.S. explained that when she was living with Petitioner, he sexually abused her four times. Id. at 168. C.S. then described each of the four instances of abuse. Id. at 172-82. She explained the first time occurred when she was 9 years old living in Jacksonville. Id. at 175. She explained she was asleep when Petitioner woke her up by pulling down her sleeping pants. Id. at 176. She stated Petitioner was not wearing pants and he touched his penis to her vagina, but she could not recall if there was penetration during that incident. Id. at 176, 226. C.S. stated that the other three occurrences of abuse occurred in Nassau County. Id. Those three occurrences happened in very similar fashions. Petitioner abused her by pulling down C.S.'s pants and his own pants, placing

his penis on C.S.'s legs and her vaginal area and would then insert his penis into her vagina and she would experience pain while he was abusing her. Id. at 172-86. C.S. testified she was 10 years old the second time he abused her; she was between the ages of 10 and 11 the third time he abused her; and she was 11 years old the fourth time he abused her. Id. She also stated that Petitioner initiated the second occurrence of sexual abuse by "putting his hands on [her] vaginal area" and then "fiddled" her genitals. Id. at 188. C.S. stated that after each occurrence, Petitioner told C.S. not to tell anyone because "it would ruin the family." Id. at 168. C.S. testified that no one, other than Petitioner, had ever placed their penis in or on her vagina. Id. at 190. She also explained that after Petitioner molested her, she began to suffer from herpes outbreaks. Id. at 190. She first noticed red bumps on her vaginal area when she was 9 or 10 years old, after the first time Petitioner abused her. Id. at 190-91. She testified that she now takes a daily prescription for the herpes virus. Id. at 192.

In June 2012, when she knew she was safely away from Petitioner and living with her grandmother, C.S. finally told her grandmother and her aunt about the abuse. Id. C.S. explained that when she told her grandmother, her grandmother immediately called the Department of Children and Families. Id. at 171. C.S. was then interviewed by someone from DCF and Child Protection Team services. Id. at 172. She also underwent a physical exam by a nurse with the CPT and a follow up exam with her regular practitioner. Id. at 212. On

cross-examination, C.S. admitted to giving inconsistent statements to her grandmother and Lori Armstrong, a CPT member, that she could not remember if Petitioner's penis penetrated her. Id. at 204, 226, 227.

Karen McQueen testified she is the office manager at University of Florida, Dunn Avenue Family Practice, a primary care facility. Id. at 248. McQueen explained one of her responsibilities is to maintain and access medical records generated by the doctors and treating nurses at the facility, and that the records are kept in the course of her regularly conducted business activity. Id. at 249. She asserted she reviewed the facility's medical records for Petitioner and C.S. Id. One of the records for C.S. was a report dated October 1, 2012, showing C.S. underwent an IGG antibodies test for the herpes simplex type 1 and type 2. Id. at 269-70. McQueen testified that the facility had no medical records suggesting Petitioner had been tested for the herpes virus. Id. at 250.

Kristi Green testified she is an advanced registered nurse practitioner employed with the CPT. Id. at 274. Green explained she has testified as an expert witness in the field of child abuse approximately 12 times in Nassau, Duval, and Clay counties. Id. at 277-78. Green asserted she conducts sexual assault exams and explained the most important evidence to consider when conducting the exam is the history given by the child. Id. at 279. According to Green, the child's medical history and statements are the most important information because a physical exam will be conducted only if the child reports

some sort of abuse; and even if abuse is reported, physical evidence of the sexual assault is not present or visible 96% of the time. Id. at 280-81.

Green stated she examined C.S. on July 2, 2012, and at the time, C.S. was 12 years old. Id. at 281. Green explained that before her exam, Lori Armstrong, another CPT employee, met with C.S. and obtained a statement of her history. Id. Green reviewed and relied on that historical statement when conducting her exam and noted that C.S. reported penile/vaginal and digital penetration. Id. at 282. Green then conducted a physical sexual assault exam of C.S. and first made the following conclusion: "sexual assault, abuse by history, and the physical findings are clear evidence of blunt force or penetrating trauma" based on the partially healed transections to C.S.'s hymen. Id. at 290. However, after her supervising physician reviewed her report and corresponding photographs, Green determined the "partially healed transections" could also be a "normal variant" of the hymen; so she altered her conclusion to the following: "physical findings are consistent with the history and neither confirm nor negate allegations of sexual assault or sexual abuse." Id. at 291.

Green further testified that C.S. advised she had a history of recurrent, intermittent red bumps on her genital area with painful urination. Id. at 292. Based on C.S.'s description and medical complaint, Green thought it was medically necessary to order a herpes IGG antibody test, which checks a patient's blood for the antibodies associated with both herpes simplex 1 and 2.

13

Id. at 292-93. Green explained herpes 1 is the strain of the virus commonly associated with mouth cold sores while herpes 2 is linked to genital herpes; however, "both types can be found in either area"; in other words, type 1 herpes can be found on your genital area and type 2 can be found on your oral area. Id. at 293. She also testified that the IGG antibodies does not distinguish between the two types of herpes strains, but merely shows whether an individual has encountered either strain at some point in their life. Id. Green testified that C.S.'s herpes IGG antibody report revealed C.S. was positive for the herpes antibodies. Id. at 300. The state then asked Green to look at C.S.'s October 2012 IGG antibody test results from C.S.'s primary care physician, which were admitted into evidence through McQueen's earlier testimony. Id. at 301. Green explained that report also indicated a positive test result. Id.

Dr. Bruce McIntosh, Green's supervisor and fellow CPT employee, testified he reviewed Green's sexual abuse report and photographs related to C.S.'s examination and he could not definitively say whether C.S. was sexually abused by penetration. Resp. Ex. G at 361. However, McIntosh explained that a lack of physical evidence or injury does not resolve the issue because such evidence is rarely visible. Id. at 359-60. He then cited several medical studies showing that only 6 to 14% of sexual abuse victims have visible physical signs of such abuse. Id. McIntosh also explained that herpes type 1 can be found in the genital or mouth area and can be transmitted either sexually or non-

14

sexually by innocent contact. Id. at 363. According to McIntosh, if a 12-year-old child who provided a history of sexual abuse was also complaining of red bumps on her genitals, he would recommend she see her primary physician during an outbreak because that is the only absolute way to diagnose the ailment; otherwise, he would suggest an IGG antibody blood test. Id. at 364. He further confirmed that if the child's only sexual contact was with the perpetrator and she had a positive IGG test, it is likely she contracted the herpes virus from the sexual assault. Id. at 365.

At the request of law enforcement, Petitioner submitted a blood sample before trial. According to Stephanie Burks, a LabCorp employee who conducted an IGG herpes antibody test on Petitioner's sample, Petitioner's IGG test results were 42.5, which is a high positive result for the presence of antibodies associated with herpes 1 or 2. Resp. Ex. G at 339. Douglas Hernandez, another LabCorp employee, testified that in March 2013, he conducted an IGG specific antibody test using Petitioner's blood sample to determine which specific strain of herpes antibodies is present in Petitioner's blood. Id. at 341-42. Hernandez explained Petitioner's sample came back positive for herpes 1 and negative for herpes 2. Id. at 343.

Detective Jeff Stull testified he was the lead detective on Petitioner's case. Id. at 384. Stull explained he interviewed Petitioner on August 1, 2012,

15

beginning the interrogation by reading Petitioner his <u>Miranda</u>[5] rights. <u>Id.</u> at 386. A video recording of Petitioner's interview with Stull was then played for the jury. <u>Id.</u> at 391-403; Resp. Ex. H at 413-24. During the interview, Petitioner initially adamantly denied ever touching C.S. inappropriately, but admitted she and his other children would sleep in the same bed with him on occasion. Resp. Ex. G at 401; Resp. Ex. H at 414-15. However, when Stull asked Petitioner how C.S. contracted herpes, Stull explained that Petitioner's demeanor and story changed. Resp. Ex. G at 403. Petitioner then admitted to inappropriate contact with C.S. but maintained that it was C.S. who initiated the encounter. Petitioner told Stull that while C.S. was sleeping in the bed with him, she woke him up by touching him and then climbed on top of him, began "grinding," and his penis may have touched her vagina before he told her to stop. Resp. Ex. H at 419-24. Petitioner further told Stull that C.S. attempted this act more than one time. <u>Id.</u> at 425. Petitioner, however, denied any occurrence of penetration.

Lori Armstrong testified that she conducted a forensic interview with C.S. after she reported the abuse. <u>Id.</u> at 439. Over defense counsel's objection, Armstrong testified to the statements C.S. made to her regarding the extent of the abuse and that C.S. described penetration had occurred. <u>Id.</u> at 442-45.

Dr. Kevin Peterson testified on behalf of the defense that he is a family

---

[5] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

physician who saw C.S. in August 2012. Id. at 437. He stated C.S.'s guardian suspected a herpes outbreak, so Peterson conducted a swab culture that revealed a yeast infection. Id. However, Peterson explained he did not request a herpes antibody test. Id. at 500.

Petitioner also called as a defense witness April McLaughlin, another CPT employee, who testified that she investigated C.S.'s family in March 2010 regarding the children missing school. Id. at 506. She explained that during her investigation, C.S. did not report any instances of sexual abuse; however, McLaughlin admitted sexual abuse was not the purpose of her investigation. Id. at 501. DCF employee Wanda Nichols testified that she investigated C.S.'s family in August and September 2011 regarding the family's poor living conditions and lack of food. Id. at 511-13. During her investigation, C.S. did not report any incidents of sexual abuse. Id.

## IV.   **Petitioner's Claims and Analysis**

### A. Ground One

Petitioner argues the trial court erred in allowing the state to present evidence and testimony about C.S. and Petitioner undergoing testing for the

17

herpes virus and the results of those tests.[6] Doc. 1 at 5. Petitioner, with help from appellate counsel, raised this claim as "Issue I" of his initial brief on direct appeal and argued three points in support of this claim. Resp. Ex. K at 24-29. First, Petitioner argued that this evidence was irrelevant and highly prejudicial because the type of herpes for which Petitioner tested positive for (herpes 1) was not the same type for which the victim's history indicated (herpes 2). Resp. Ex. K at 24.  Next, he asserted that any evidence of the IGG test performed on C.S. was inadmissible because the state presented no witness from which the trial court could determine the reliability of the IGG test in accordance with Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993). Finally, Petitioner argued testimony from witness Kristi Green that C.S. tested positive for the herpes antibodies violated his confrontation rights under Crawford v. Washington, 541 U.S. 36 (2004), because "she did not conduct the test and therefore her testimony was impermissible hearsay." Resp. Ex. K at 29.

The state filed an answer brief addressing each argument. It argued evidence that Petitioner is a carrier for herpes type 1 and that C.S. is a carrier for the herpes antibody is relevant, because even if they both carried herpes

---

[6] While the allegations of the Petition are vague, a reading of the Response and Petitioner's Reply clarify that Grounds One through Six are the same issues as those alleged during Petitioner's direct appeal. For ease of reading, the Court directly summarizes these grounds by using the allegations in Petitioner's initial brief on appeal rather than quoting the Petition.

type 1, such strain can be transmitted through sexual contact. Resp. Ex. L at 21. As to Petitioner's argument that testimony regarding the IGG test failed to comply with the requirements of <u>Daubert</u>, the state outlined a three-part test by which to determine whether expert testimony is admissible: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in <u>Daubert</u>; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. <u>Id.</u> It then argued that Green satisfied this test because she is a board-certified nurse practitioner who had seen approximately 300 to 400 victims of child sexual abuse. It noted Green's explanation that while C.S. was not experiencing physical manifestations of the virus when she examined her, the medical history C.S. provided prompted Green to order the IGG test. Green considered the IGG test to be medically necessary and is ordinarily used to diagnose and treat the herpes virus. According to Green, it is rare for the IGG test to produce a false positive and while the test does not differentiate based on the specific strain of the virus, the IGG test would still be performed for either strain because treatment for both types of the virus is the same. To that end, the state also argued that the existence of an IGG specific antibody test

does not prove that the general IGG test is unreliable, but merely goes to the weight of the evidence.

Finally, as to Petitioner's claim that admission of the medical reports and IGG tests violated his confrontation rights under Crawford, the state argued that the reports were not prepared in anticipation of trial, but were instead found to have been prepared for the purpose of medical diagnosis and treatment. Resp. Ex. L at 25. Thus, the reports were non-testimonial and did not implicate Petitioner's rights under Crawford. Id. In any event, the state argued that even assuming Petitioner was correct in this claim, the presentation of these IGG results was harmless. Id. at 26. It explained that the herpes diagnosis "allowed for argument asserting contrary interpretations of the evidence, some of which was highly favorable to [Petitioner]"; and Petitioner actively discredited Green's testimony based on her supervisor's disagreement with her findings. However, the state noted that the state's other evidence showing Petitioner committed the crime was strong, including Petitioner's video recorded confession. Id. The First District Court of Appeal per curiam affirmed Petitioner's judgment and sentence without a written opinion. Resp. Ex. M.

Respondents contend that this claim is unexhausted because Petitioner only argued it as an issue of state law in state court. Resp. at 42. For purposes of this Order, the Court assumes this claim is exhausted and otherwise cognizable on federal habeas review. Nevertheless, this claim lacks merit

because the First DCA's decision is entitled to AEDPA deference. Petitioner's own statement to police during his interrogation and C.S.'s testimony that Petitioner abused her while she was between the ages of 9 and 11 were enough to support the jury's verdict. Thus, the state court's evidentiary ruling did not "'so infuse[] the trial with unfairness as to deny due process of law.'" Smith v. Jarriel, 429 F. App'x 936, 937 (11th Cir. 2011) (quoting Felker v. Turpin, 83 F.3d 1303, 1311-12 (11th Cir. 1996)). In consideration of the foregoing, the Court concludes that the state appellate court's summary adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. Nor was the state appellate court's adjudication based on an unreasonable determination of the facts given the evidence presented in the state court proceedings. As such, Ground One is due to be denied.

## B. Ground Two

Petitioner argues the trial court erred in allowing Armstrong to testify to hearsay statements that C.S. made to her during their CPT interview. Doc. 1 at 6. Petitioner raised this claim as "Issue II" during his direct appeal. Resp. Ex. K at 30. He argued that this testimony was inadmissible because the state (1) "never filed a notice of its intent to introduce child hearsay statements under Section 90.803(23), Florida Statutes"; and (2) the trial court made no specific findings of reliability and trustworthiness as required by section 90.803(23), and State v. Townsend, 635 So. 2d 949 (Fla. 1994). Resp. Ex. K at 30.

21

The state filed an answer brief arguing, inter alia, that the state did not file a notice of intent to rely on child hearsay because the victim was 12 years of age when she reported the sexual abuse; the testimony was being offered under the "rule of completeness"; and any error in admission of this testimony was harmless, because C.S. also testified about her statements to Armstrong and C.S. was subject to extensive cross-examination. Resp. Ex. L at 28. The First DCA per curiam affirmed Petitioner's judgment and sentence without a written opinion. Resp. Ex. M.

Respondents again contend that this claim is unexhausted because Petitioner only argued it as an issue of state law in state court. Resp. at 42. For purposes of this Order, the Court assumes this claim is exhausted and otherwise cognizable on federal habeas review. Yet, it is without merit because the First DCA adjudication of this claim is entitled to deference. Petitioner's trial attorney questioned C.S. on cross-examination about the alleged inconsistent statements she made to Armstrong. Resp. Ex. F at 204, 226-27. Further, considering Petitioner's recorded police interrogation and the other evidence of his culpability, Petitioner cannot show that Armstrong's testimony or the state court's adjudication of this claim "'so infuse[d] the trial with unfairness as to deny due process of law.'" Smith, 429 F. App'x at 937 (quoting Felker, 83 F.3d at 1311-12). The state court's conclusion was not contrary to clearly established federal law and did not involve an unreasonable application

of clearly established federal law. Nor was the state court's adjudication based on an unreasonable determination of the facts given the evidence presented in the state court proceedings. Accordingly, Ground Two is due to be denied.

### C. Ground Three

Petitioner asserts the trial court erred in denying Petitioner's motion for judgment of acquittal as to count four of the Information, arguing that the evidence was insufficient to prove that C.S. was under 12 years old at the time he committed that charge of capital sexual battery. Doc. 1 at 7.

At the close of the state's case, trial counsel moved for a judgment of acquittal on count four, arguing that the statement of particulars for that count alleged Petitioner committed the sexual battery between January 1, 2010, and October 10, 2011; which was the last day before C.S. turned 12. Resp. Ex. H at 462. Trial counsel further argued that C.S. testified she could not remember if the last sexual assault occurred before she turned 12, and C.S.'s school records show that C.S. moved back to Jacksonville on October 14, 2011, which is after she turned 12. Id. at 463. In response, the state argued that C.S. told Armstrong that the abuse occurred while she was between the ages of 9 and 11, and that if trial counsel wanted to argue that the last capital offense occurred during the four days between her twelfth birthday and the day she moved back to Jacksonville, that would be a decision the jury could make. Id. at 466. The trial

court then denied Petitioner's motion for judgment of acquittal as to count four. Id. at 470.

On direct appeal, with the benefit of counsel, Petitioner raised this claim as "Issue III." Resp. Ex. K at 35-36. In its answer brief, the state pointed to the following trial testimony from C.S. about count four:

> Q:    [W]hen your mother sent you to live with your grandmother . . . that was October of 2011.
>
> A:    Yes, ma'am.
>
> Q:    And do you know how old you turned in October of 2011?
>
> A:    11.
>
> Q:    In October of 2011, you would have been 11 and you would have turned 12?
>
> A:    12.
>
> Q:    Okay. So, were you younger than 12 when the defendant abused you the last time?
>
> A:    Yes, ma'am.

Resp. Ex. L at 35; Resp. Ex. F at 185. The state again pointed to Armstrong's testimony that C.S. told her the last incident took place when she was 11. Resp. Ex. H at 447. The First DCA per curiam affirmed Petitioner's judgment and sentence without a written opinion. Resp. Ex. M.

Respondents again contend that this claim is unexhausted because Petitioner only argued it as an issue of state law in state court. Resp. at 42. For

purposes of this Order, the Court assumes this claim is exhausted and otherwise cognizable on federal habeas review. Nevertheless, to the extent that the First DCA affirmed the trial court's denial of Petitioner's motion for judgment of acquittal on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications.

When reviewing an insufficiency of the evidence claim in a habeas petition, a federal court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The court must assume that the jury resolved any evidentiary conflicts in favor of the prosecution, and the court must defer to that resolution. Id. Here, the jury found Petitioner guilty of count four – capital sexual battery – and in doing so, found the state proved the following elements beyond a reasonable doubt: Petitioner was eighteen years of age or older and committed a sexual battery upon C.S., a person less than 12 years of age. Resp. Ex. A at 123; § 794.011(2)(a), Fla. Stat. To prove "sexual battery" the state needed to prove "oral, anal, or vaginal penetration by, or union with, the sexual organ of another." § 794.011(1)(h), Fla. Stat. Taken in the light most favorable to the state, the Court finds there was sufficient evidence to permit a rational trier of fact to find Petitioner guilty of this offense.

As such, upon review of the record, this Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Ground Three is due to be denied.

### D. Ground Four

Petitioner argues the trial court erred in denying his request that the jury be instructed on the lesser included offense of attempted sexual battery. Doc. 1 at 8-9. Petitioner raised this claim as "Issue IV" during his direct appeal. Resp. Ex. K at 37-39. In its answer brief, the state argued the trial court properly denied Petitioner's request for this instruction because the evidence supported a complete act of sexual battery, not an attempt. Resp. Ex. L at 39. It further argued that attempted sexual battery is only a permissive lesser included offense and any error in not instructing the jury on it was harmless, especially in light of the jury's verdict finding Petitioner guilty of capital sexual battery as charged in the Information. Id. The First DCA per curiam affirmed Petitioner's judgment and sentence without a written opinion. Resp. Ex. M.

Respondents again contend that this claim is unexhausted because Petitioner only argued it as an issue of state law in state court. Resp. at 42. For purposes of this Order, the Court assumes this claim is exhausted and

otherwise cognizable on federal habeas review. Nevertheless, it is without merit because the state court's adjudication of this claim is entitled to deference.

Petitioner must show that the state trial court's failure to read the instruction so infected the entire trial that his resulting conviction violated due process. Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (citing Cupp v. Naughten, 414 U.S. 141, 147 (1973)). The Court does not judge the allegedly erroneous instruction "in artificial isolation," but considers the instruction in the context of the trial record and the jury instructions as a whole. Id. at 152 n.10 (citing Boyd v. United States, 271 U.S. 104, 107 (1926)). Further, "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Id. at 154. Accordingly, where, as here, the alleged error is an omitted instruction, the burden on the petitioner is "especially heavy." Id.

The trial court instructed the jury on counts one, two, and four using the standard jury instruction for sexual battery upon a person less than 12 years of age. Resp. Ex. A at 130; see also Florida Standard Jury Instruction 11.1. In doing so, it also read the instruction for the necessary lesser included offense of battery. Id. Attempt is not a necessary lesser included offense, and the evidence did not support the reading of the attempt instruction. During his interrogation, Petitioner admitted his sexual organ had union with C.S.'s sexual organ. When viewed in the context of the trial as a whole, Petitioner has not met his heavy burden of showing that the trial court's failure to read the attempt instruction

violated due process. The state court's adjudication was neither contrary to, nor based upon an unreasonable application of <u>Henderson</u> or any other clearly established federal law. Nor is it an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Ground Four is due to be denied.

### E. Ground Five

Petitioner argued the trial court erred in prohibiting Petitioner from introducing evidence of C.S.'s prior sexual encounters. Doc. 1 at 9. Petitioner raised this claim as "Issue V" during his direct appeal. Resp. Ex. K at 40. According to Petitioner, his defense at trial was that C.S. was fabricating the allegations against Petitioner, so he sought to introduce the testimony of Marina Anderson to show C.S. had prior knowledge of sexual activity, because C.S. was investigated for alleged sexual misconduct involving her sister and a friend in 2008 and that C.S. did not disclose Petitioner's alleged misconduct during that investigation. <u>Id.</u> He also sought to introduce the testimony of Bruce Wheeler who sexually abused C.S. during the time she was living with him. <u>Id.</u> Petitioner averred this evidence would corroborate his statements to police that C.S. initiated the contact while Petitioner was asleep. <u>Id.</u>

In its answer brief, the state argued that the trial court properly excluded the testimony of Bruce Wheeler because it was not relevant to a material fact in issue. Resp. Ex. L at 41. It asserted that "[o]nly after the victim disclosed

abuse by appellant and appellant was arrested, did the victim's grandfather, Bruce Wheeler, touch the child's breasts. The child immediately reported this to her grandmother, the police were notified, and Wheeler was arrested and convicted." Id. As to Anderson, the state argued, inter alia, that even if the trial court erred in excluding testimony from this witness, such error was harmless because the state presented competent and substantial evidence of Petitioner's guilt, and "[t]his is particularly true where [Petitioner] admitted sexual contact with the victim." Id. at 43. The First DCA per curiam affirmed Petitioner's judgment and sentence without a written opinion. Resp. Ex. M.

To the extent the First DCA adjudicated this issue on the merits, that adjudication is entitled to deference. As to Anderson, prior to trial, trial counsel argued she may call Anderson, a former DCF employee, as an impeachment witness, if during her cross-examination, C.S. testified that she reported the sexual abuse to Anderson during Anderson's 2008 investigation into unrelated incidents. Resp. Ex. C at 82. Trial counsel agreed with the trial court that calling Anderson for any purpose other than impeachment would be hearsay. Id. During trial counsel's cross-examination of C.S., C.S. testified that she was interviewed by multiple DCF workers during "various times over the years" regarding her living situation, and that she never reported Petitioner's sexual abuse. Resp. Ex. F at 201. Since C.S. admitted she did not report Petitioner's abuse during prior DCF investigations, trial counsel did not need to call

Anderson for impeachment purposes. Further, any potential testimony from Wheeler regarding his sexual abuse of C.S. was irrelevant because it was not similar in nature to the abuse Petitioner committed, and Wheeler abused C.S. after Petitioner was arrested.

As such, upon review of the record, this Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Ground Five is due to be denied.

**F. Ground Six**

Petitioner argues the trial court erred in allowing, over trial counsel's objection, McIntosh to reference medical studies, journals and treatises to support his expert opinion that physical evidence of sexual abuse is seldom found in alleged victims. Doc. 1 at 10. Petitioner raised this claim as "Issue VI" during his direct appeal, asserting the medical documents impermissibly bolstered McIntosh's credibility and amounted to hearsay. Resp. Ex. K at 44.

In its answer brief, the state argued that McIntosh's reference to these medical journals and documents was not impermissible because he was merely referencing facts and data reasonably relied upon by experts on the subject. Resp. Ex. L at 44-45. It further asserted that any error was harmless because

such testimony was extremely brief, Petitioner cross-examined McIntosh about the same publications, Petitioner used McIntosh to undermine Green's testimony and findings, and such testimony did not affect the verdict. Id. at 45.

Respondents again contend that this claim is unexhausted because Petitioner only argued it as an issue of state law in state court. Resp. at 58. For purposes of this Order, the Court assumes this claim is exhausted and otherwise cognizable on federal habeas review. Nevertheless, it is without merit because the state court's adjudication is entitled to deference. Upon review of the record as a whole and considering the totality of the evidence produced at trial, the Court finds the state court's adjudication was not contrary to clearly established federal law and did not involve an unreasonable application of clearly established federal law. Nor was the state court's adjudication based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Ground Six is due to be denied.

### G. Ground Seven

Petitioner argues his trial counsel was ineffective for failing to adequately make a contemporaneous objection to McIntosh's use of inadmissible learned treatises to bolster his own credibility. Doc. 1 at 11. Petitioner raised this claim as his only ground in his Florida Rule of Criminal Procedure 3.850 motion for postconviction relief. Resp. Ex. O at 4. The trial court summarily denied the claim, finding in pertinent part as follows:

In his Motion for Postconviction Relief the defendant presents one ground regarding defense counsel's failure to object to the testimony of Dr. Bruce McIntosh, an expert witness called by the State. In his argument, defendant states: "This ground was raised on the defendant's direct appeal." The First District Court of Appeal per curiam affirmed. Accordingly it is

**ORDERED AND ADJUDGED**:

1. The motion is denied.

Id. at 10. The First DCA per curiam affirmed the trial court's summary denial without a written opinion. Resp. Ex. P. To the extent that the First DCA affirmed the trial court's denial on the merits, the Court will address this claim in accordance with the deferential standard for federal court review of state court adjudications.

Considering the weight of the evidence against Petitioner, even in the absence of any testimony from McIntosh, Petitioner cannot demonstrate that but for trial counsel's alleged errors, the outcome of his trial would have been different. As previously noted in Ground Six, the parties thoroughly addressed McIntosh's use of these medical documents during his testimony and the First DCA per curiam affirmed Petitioner's challenge to it on direct appeal. Thus, upon thorough review of the record and the applicable law, the Court concludes that the state court's decision to deny Petitioner's claim was neither contrary to nor an unreasonable application of Strickland, and it is not based on an

unreasonable determination of the facts in light of the evidence presented to the state court. Ground Seven is due to be denied.

### Grounds Eight through Seventeen

In the Petition, Petitioner concedes he did not exhaust his state court remedies for Grounds Eight through Seventeen.[7] Doc. 1 at 13-37. However, he contends that his failure to exhaust these claims should be excused under Martinez because he was not represented by counsel during his initial postconviction proceedings. Reply at 21. Respondents contend Petitioner has failed to demonstrate that these defaulted claims are substantial, thus, they argue he cannot rely on Martinez to overcome the procedural defaults. See generally Resp. at 65-106.

Under Martinez, Petitioner must demonstrate more than the general assertion that the trial court did not appoint counsel in the initial-review collateral proceeding. 566 U.S. at 14. Petitioner must "also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some

_____

[7] Despite conceding in his Petition that these claims are unexhausted, Doc. 1 at 13-37, in his Reply, Petitioner asserts he raised these claims in state court through a "Motion for Leave to File a Second Motion for Postconviction Relief"; the trial court and appellate court denied that motion; and Respondents failed to include those postconviction filings in their exhibits. Reply at 20-21. Nevertheless, even assuming Petitioner raised these claims in state court through a successive Rule 3.850 motion, he is not entitled to federal habeas relief because these claims are unsubstantial and without merit.

merit." Id. (citations omitted); see also Lambrix v. Sec'y Fla. Dept. of Corr., 851 F.3d 1158, 1164 (11th Cir. 2017).  Conversely, his claim is "insubstantial" if "it does not have any merit or . . . is wholly without factual support." Id. at 16. For the reasons that follow, the Court finds that even if Petitioner demonstrates that his lack of postconviction counsel caused his procedural default, he cannot demonstrate that his underlying ineffective-assistance-of-counsel claims are substantial in order to establish cause and prejudice under Martinez.

**H. Ground Eight**

Petitioner argues his trial counsel was ineffective for failing to "adequately investigate and conduct any meaningful adversarial testing process against the state's case . . . ." Doc. 1 at 13. According to Petitioner, he informed counsel prior to trial that his medical records demonstrated "he tested positive for Herpes HSV [oral] antibodies; but was not diagnosed as having the HSV-active virus itself; and that, he was not diagnosed as having Herpes HSV-2 [genital] antibodies or virus," which is the type that C.S. supposedly contracted. Id. at 14. He claims that had counsel presented evidence of Petitioner's specific strain of herpes during the suppression hearing, the trial court would have suppressed any evidence of herpes test results and he would have been acquitted at trial. Id.

As Respondents adequately note, "Petitioner's claim is predicated on a false premise that oral herpes cannot infect genitalia and genital herpes cannot

infect the mouth." Resp. at 69. However, McIntosh testified at trial that both strains of herpes can be found in the genital area and/or the mouth area. Resp. Ex. G at 363. Because Petitioner's allegation that he was prejudiced by trial counsel's alleged deficiency lacks factual support and is meritless, Petitioner's Strickland claim is unsubstantial, and Martinez does not apply to excuse his default. Thus, Ground Eight is due to be denied.

### I. Ground Nine

Petitioner claims his trial attorney was ineffective for failing to interview, secure, and/or present readily available defense witnesses at trial. Doc. 1 at 15. According to Petitioner, C.S.'s mother, Kelli Gibbs, was available to testify that she spoke with C.S. after Petitioner's arrest and determined that C.S. was lying about Petitioner's abuse. Id. at 16. He also claimed Kelli Gibbs would have testified Petitioner never slept in the bed with C.S. while they were living in the home where the first incident allegedly occurred; Petitioner and all the children would always jointly attend Kelli Gibb's doctor appointments, never leaving Petitioner at home alone with the children; and that Kelli Gibbs was never hospitalized while they were living with Katrina Strickland, the home where the last incident allegedly occurred. Id. at 17. Petitioner also argues trial counsel should have presented Katrina Strickland as a witness, because she would have testified that when Petitioner, C.S., and Kelli Gibbs lived with her, Petitioner and C.S. were never left in the residence alone and at no time were

35

any bedding materials left in the living room. Id. at 8. Petitioner finally asserts trial counsel should have presented Jonathan and Joshua Strickland who would have also testified that Petitioner and C.S. were never left at their residence alone without Kelli Gibbs present and their mother, Katrina Strickland, actively watched them throughout the day. Id. at 19.

After the state presented its case, Petitioner, under oath, advised the trial court that he was aware of the witnesses trial counsel intended to call and stated there were no other witnesses he wished to present. Resp. Ex. H at 491-93. He cannot now go behind that sworn testimony. Further, even assuming trial counsel was deficient in failing to present these witnesses at trial, Petitioner cannot demonstrate prejudice. During his police interrogation, Petitioner admitted that he would occasionally sleep in the same bed as C.S. and that while in the bed together, he had sexual contact with C.S. Petitioner admitted this occurred on numerous occasions, conceding he had the opportunity to commit these offenses. Further, C.S. testified that one of the sexual batteries occurred while her little sister was also in the bed, demonstrating that Petitioner did not have to be alone with C.S. to commit these crimes. As such, he cannot show that but for counsel's failure to present these witnesses, the outcome of his trial would have been different. Petitioner's Strickland claim is unsubstantial, and Martinez does not apply to excuse his default. Thus, Ground Nine is due to be denied.

36

## J. Ground Ten

Petitioner contends his trial counsel was ineffective for failing to file a motion in limine to exclude Green's testimony regarding her erroneous initial observational conclusion that C.S. suffered "blunt force penetrating trauma" and her testimony that she changed that conclusion after consulting with her supervisor. Doc. 1 at 21. He argues Green's testimony should have been suppressed because it was cumulative to Dr. McIntosh's testimony and contributed to confusion of the issues, causing prejudice to Petitioner. Id. at 22.

Despite Petitioner's argument, trial counsel used Green's conflicting findings to Petitioner's advantage. During McIntosh's cross-examination, counsel highlighted Green's initial false findings and used that error to challenge Green's reliability and credibility. Resp. Ex. G at 368-69. Trial counsel also elicited testimony that following Green's initial false finding, McIntosh implemented a new policy that he would review any reports and findings that show positive results for sexual abuse. Id. at 369. Trial counsel's use of Green's testimony may have been strategic, and such actions are not deficient. Nevertheless, even assuming trial counsel acted deficiently here, Petitioner cannot demonstrate prejudice because absent any testimony from Green or McIntosh, the other evidence produced at trial was enough to support the jury's verdict. Because Petitioner's allegation that he was prejudiced by trial counsel's alleged deficiency lacks factual support and is meritless, Petitioner's

<u>Strickland</u> claim is unsubstantial, and <u>Martinez</u> does not apply to excuse his default. Ground Ten is due to be denied.

### K. Ground Eleven

Petitioner argues that trial counsel was ineffective for failing to "secure an adequate <u>Williams</u>[8] Rule Hearing, with the presentation of witnesses, in order to develop a sound and proper record." Doc. 1 at 23-24. According to Petitioner, the state sought to introduce similar fact evidence of other uncharged acts, which were not inextricably intertwined with the charged offenses; and counsel inadequately moved to suppress such acts. <u>Id.</u>

Prior to trial, the trial court conducted an evidentiary hearing on defense counsel's second motion in limine, in which trial counsel sought to exclude evidence of the uncharged crime involving Petitioner sexually abusing C.S. in Duval County, Florida. Resp. Ex. C at 4. Trial counsel did not present C.S. as a witness during the evidentiary hearing, but instead asked to present her pretrial deposition testimony instead. <u>Id.</u> at 47. The state argued that trial counsel's argument was more akin to a contention that such testimony should be excluded based on its irrelevance instead of the inadmissible <u>Williams</u> rule or collateral crime evidence. <u>Id.</u> at 50-51. In support of that argument, the state highlighted that the Jacksonville incident involved the same victim, and was

---

8 <u>Williams v. State</u>, 110 So. 2d 654, 662 (Fla. 1959).

the initial incidence of abuse, as such, the uncharged crime provided a background for the charged crimes that followed in Nassau County. <u>Id.</u> In accordance with trial counsel's request, the trial court agreed to review C.S.'s deposition testimony and her CPT interview instead of subjecting C.S. to another round of in-court questioning. <u>Id.</u> at 53. After the court reviewed her statements, it entered an order denying Petitioner's request to exclude the evidence, finding "[t]he similar fact evidence is relevant to corroborate the alleged victim's testimony and to show a pattern of conduct . . . ." Resp. Ex. A at 113.

In the Petition, Petitioner avers counsel should have objected to the presentation of no witnesses, and but for that failure, the evidence would not have been admitted and the outcome of his trial would have been different. However, because the trial court considered sworn testimony when denying the motion in limine, Petitioner cannot demonstrate that trial counsel was ineffective for failing to call witnesses during the hearing on the motion in limine. Thus, because Petitioner's allegation lacks factual support and is meritless, Petitioner's <u>Strickland</u> claim is unsubstantial, and <u>Martinez</u> does not apply to excuse his default. As such, Ground Eleven is due to be denied.

### L. Ground Twelve

Petitioner contends his trial counsel was ineffective for failing to adequately move for a continuance on the day of trial, so she could secure the

39

presence of a defense expert witness and thoroughly prepare regarding new/additional circumstances that were presented to defense counsel that morning. Doc. 1 at 26. Petitioner acknowledges that trial counsel was previously granted a continuance due to a conflict with "said expert['s]" scheduling; but failed to properly move again by filing a written motion. Id. He claims that but for trial counsel's failure, the jury would have returned a different verdict. Id. at 26.

As Respondents explain, Petitioner does not allege who this defense expert is or what he/she would have testified to had trial counsel obtained a second continuance on the morning of trial. Further, the record refutes Petitioner's allegations that he and trial counsel were unprepared for trial or received new information the morning trial began. Notably, on the morning of trial, the parties informed the court that they were ready to proceed, that they had discussed any pending issues the Friday before, and the state advised, "I haven't provided anything new this morning." Resp. Ex. F at 140. Further, after the state presented its case, Petitioner, under oath, advised the trial court that trial counsel advised Petitioner of the witnesses they planned to call on his behalf, that he did not wish to testify, and that there were no other witnesses he wished to call. Resp. Ex. H at 491-93. Thus, because Petitioner's allegation lacks factual support and is meritless, Petitioner's Strickland claim is

unsubstantial, and <u>Martinez</u> does not apply to excuse his default. Ground Twelve is due to be denied.

### M. Ground Thirteen

Petitioner argues trial counsel was ineffective for "failing to secure a constitutionally adequate racially unbiased jury. . . ." Doc. 1 at 27. According to Petitioner, after jury selection, he was transported back to the jail where another inmate informed him that his jury panel should have included other African Americans to choose from. <u>Id.</u> at 28. The next morning, Petitioner informed trial counsel "of his discovery and desire to have said constitutionally racially balanced and unbiased jurors of his peers to hear and deliberate for his criminal trial proceedings." <u>Id.</u> He notes that trial counsel notified the trial court of Petitioner's concern, but when the trial court denied the request, trial counsel failed to further object, allowing the trial to proceed with a "racially biased jury." <u>Id.</u> at 28.

At the close of jury selection, Petitioner advised the trial court the panel selected was acceptable to him. Resp. Ex. E at 123. Thereafter, on the morning of trial but prior to the jury being sworn in, trial counsel advised the court of the following:

> MS. JAMIESON: Um, Your Honor, Mr. Gibbs asked that I note for purposes of the record that there were no, um, no African American members on the entire potential panel. I've explained to him that we already accepted, you know, who we selected and who

> the Court is intending to impanel this morning, but he did just want me to note for purposes of the record that there weren't any members of his race out of the entire panel as a whole.
>
> THE COURT: Thank you. Ready to bring in the jury?

Resp. Ex. F at 140-41. Thus, Petitioner's counsel did raise the issue and the trial court overruled the objection. Moreover, Petitioner does not argue that a biased juror was selected and deliberated in his case, and his allegations here are conclusory. See, e.g., United States v. Guy, 924 F.2d 702, 706 (7th Cir. 1991) ("Mere observation that there were no African-Americans on a panel that was drawn from a population containing African-Americans simply is not sufficient to demonstrate any systematic exclusion."). Further, because Petitioner personally affirmed his acceptance of the selected jury, he cannot demonstrate that the trial court would have granted his request to strike the entire panel had trial counsel pursued this issue further. See Price v. Sec'y Dep't of Corr., 558 F. App'x 871, 872-73 (11th Cir. 2014) (holding that it was not unreasonable application of clearly established federal law for the Florida courts to conclude that defendant could not argue that counsel had been ineffective for failing to strike a juror that the defendant had approved); Kelley v. State, 109 So. 3d 811, 812 (Fla. 1st DCA 2013) ("Thus, it follows that a defendant who, like Appellant, personally affirms his acceptance of the jury panel will not be heard to complain in a postconviction motion that his counsel was ineffective for allowing a biased

juror to serve on his jury."). Thus, because Petitioner's allegation lacks factual support and is meritless, Petitioner's <u>Strickland</u> claim is unsubstantial, and <u>Martinez</u> does not apply to excuse his default. Ground Thirteen is due to be denied.

### N. Ground Fourteen

Petitioner argues trial counsel was ineffective for failing to object and require C.S. to wait outside the courtroom during trial since she was a witness and subject to the rule of sequestration. Doc. 1 at 29-30. According to Petitioner, proper sequestration of C.S. would have allowed trial counsel to recall C.S. and adequately impeach her with statements made by other witnesses; and he claims that allowing her to remain in the courtroom during trial, "allowed a <u>Giglio</u>[9] violation to go uncorrected." <u>Id.</u> at 30

Petitioner fails to identify what testimony by C.S. was allegedly false and, thus, this claim is also conclusory. Further, at the commencement of trial, the state advised the trial court that C.S. requested to remain in the courtroom following her testimony. Resp. Ex. F at 139. Trial counsel responded they did not anticipate calling C.S. as a witness; and thus, the trial court allowed C.S. to remain in the courtroom. <u>Id.</u> at 139. Under section 90.616(1) and (2)(d), Florida Statutes, a victim of a crime and the parent or guardian of a minor child victim

---

[9] <u>Giglio v. United States</u>, 405 U.S. 150 (1972).

are excluded from the rule of sequestration unless the court determines such person's presence to be prejudicial. Here, C.S., as the minor child victim, had a right to be present in the courtroom and the trial court found that her presence was not so prejudicial as to burden that right. Counsel cannot be deficient for failing to make a meritless objection. Because Petitioner's allegation lacks factual support and is meritless, Petitioner's Strickland claim is unsubstantial, and Martinez does not apply to excuse his default. Ground Fourteen is due to be denied.

### O. Ground Fifteen

Petitioner contends trial counsel was ineffective for failing to object to the state's improper comments made during opening and closing, which bolstered the credibility of the victim and other witnesses. Doc. 1 at 31-32. He also argues that trial counsel's comment during closing that C.S. had an inability to understand the importance of telling the truth improperly bolstered her credibility because it excused her "blatant perjury." Id. at 32.

Petitioner's claim is again conclusory, and he does not identify any specific comment by the state or counsel that would amount to the type of prejudice for which he alleges. A reviewing court must evaluate an allegedly improper comment in the context of both the prosecutor's entire closing argument and the trial as a whole, because "[c]laims of prosecutorial misconduct are fact-specific inquiries which must be conducted against the

44

backdrop of the entire record." <u>United States v. Hall</u>, 47 F.3d 1091, 1098 (11th Cir. 1995); <u>accord</u> <u>United States v. Young</u>, 470 U.S. 1, 11 (1985) ("[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by doing so can it be determined whether the prosecutor's conduct affected the fairness of the trial."). The Court reviewed the state's opening and closing argument and finds that, in context, these statements are merely a recitation of the facts. Resp. Ex. F at 150-55; Resp. Ex. G at 553-74. Further, the Court reviewed trial counsel's closing argument and finds that her statements were not improper, but rather in line with her argument that the state failed to prove the offenses beyond a reasonable doubt and that C.S.'s inconsistent statements show she "doesn't understand the magnitude of taking an oath." Resp. Ex. G at 579-602. Trial counsel was not deficient for failing to make a meritless objection, and her closing argument did not prejudice Petitioner. Because Petitioner's allegation lacks factual support and is meritless, Petitioner's <u>Strickland</u> claim is unsubstantial, and <u>Martinez</u> does not apply to excuse his default. Ground Fifteen is due to be denied.

### P. Ground Sixteen

Petitioner argues his trial attorney was ineffective for failing to ensure that a "<u>Williams</u> Rule jury instruction" was given to the jury prior to the presentation of testimony regarding the similar uncharged crime. Doc. 1 at 33.

45

According to Petitioner, trial counsel's failure to request that this instruction be read to the jury prior to C.S.'s testimony about the Jacksonville incident precluded the jury from distinguishing between uncharged crimes and charged crimes, and thus, affected its verdict. Id.

While the trial court did not instruct the jury on other crimes evidence immediately prior to C.S.'s testimony, the state referenced the evidence in its opening statement and advised the jury that C.S. will testify that the abuse started in Jacksonville "although that charge is not before you to make a decision on." Resp. Ex. F at 151. Further, during the final charge to the jury, the trial court did instruct the jury on Florida Standard Jury Instruction 3.8(a) regarding "Williams Rule" evidence and advised Petitioner cannot be convicted of a crime not included in the Information. Resp. Ex. A at 137. As such, prior to deliberations, the jury received the proper instruction, and Petitioner cannot demonstrate that but for counsel's failure to request that the instruction be read at an earlier time, the outcome of his trial would have been different. Because Petitioner's allegation lacks factual support and is meritless, Petitioner's Strickland claim is unsubstantial, and Martinez does not apply to excuse his default. Ground Sixteen is due to be denied.

## Q. Ground Seventeen

Petitioner argues the cumulative effect of his trial counsel's errors deprived him of a fair trial. Doc. 1 at 35-36. "The cumulative error doctrine

provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." United States v. Baker, 432 F.3d 1189, 1223 (11th Cir. 2005) (internal quotation marks omitted). The Eleventh Circuit addresses "claims of cumulative error by first considering the validity of each claim individually, and then examining any errors that [it] find[s] in the aggregate and in light of the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial." Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1132 (11th Cir. 2012). Because the Court has determined that none of Petitioner's individual claims of error or prejudice have merit, Petitioner's cumulative error claim cannot stand. See United States v. Taylor, 417 F.3d 1176, 1182 (11th Cir. 2005) ("[There being] no error in any of the district court's rulings, the argument that cumulative trial error requires that this Court reverse [the defendant's] convictions is without merit."). As such, Ground Seventeen is due to be denied.

### R. Ground Eighteen

Petitioner asserts the trial court did not have subject matter jurisdiction to impose Petitioner's judgment and sentence because the "documented evidence, and, testimony of a records custodian, substantiates that Petitioner Gibbs and/or C.S. w[ere] not within Nassau County, Florida during the dates of the charging Information." Doc. 1 at 37. Petitioner raised this issue in state

court through a petition for writ of habeas corpus. Resp. Ex. T at 8-22. The trial court issued a one-sentence order denying the claim. Id. at 23. Petitioner appealed, and the First DCA per curiam affirmed the trial court's summary denial without a written opinion. Resp. Ex. X. Upon review of the record as a whole and considering the totality of the evidence produced at trial, the Court finds the state court's adjudication was not contrary to clearly established federal law and did not involve an unreasonable application of clearly established federal law. Nor was the state court's adjudication based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Ground Eighteen is due to be denied.[10]

Accordingly, it is

**ORDERED AND ADJUDGED:**

1.      The Petition (Doc. 1) is **DENIED** and this case is **DISMISSED WITH PREJUDICE**.

---

[10] In his Reply, Petitioner raises for the first time a claim regarding "Judge Robert Foster and other various circuit court judges in the Florida State Judiciary" being investigated for "blatant racially biased decisions" around the time of Petitioner's trial. Reply at 29. In support of this allegation, Petitioner attaches a news article titled "Florida's sentencing system: It fails to account for prejudice." Doc. 40-1. However, arguments raised for the first time in a reply brief are not properly before a reviewing court. See Herring v. Sec'y, Dep't of Corr., 397 F.3d 1338, 1342 (11th Cir. 2005) (citations omitted). Thus, the Court declines to address this allegation. However, the Court notes that the crime for which the jury convicted Petitioner required Judge Foster to impose a mandatory life sentence.

2.      The **Clerk of Court** shall enter judgment accordingly, terminate any pending motions, and close this case.

3.      If Petitioner appeals this Order, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[11]

**DONE AND ORDERED** at Jacksonville, Florida, this 30th day of September, 2020.

TIMOTHY J. CORRIGAN
United States District Judge

Jax-7

C:      Larry Alonzo Gibbs, Jr., #144225
        Bryan G. Jordan, Esq.

---

[11] The Court should issue a certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).  Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.

49